United States District Court
Southern District of New York
-------------------------------------------------

United States of America,

    -against-

                                              15 Cr. 139 (LTS)

Samuel Waldman,

                Defendant.
-------------------------------------------------

## Defendant Samuel Waldman's Sentencing Submission
### (REDACTED)

                                          Federal Defenders of New York
                                          Attorney for Defendant
                                          Samuel Waldman
                                          52 Duane Street - 10th Floor
                                          New York, New York 10007
                                          Tel.: (212) 417-8792
                                          Jonathan Marvinny

                                          *Of Counsel*

To:  Preet Bharara, Esq.
      United States Attorney
      Southern District Of New York
      One St. Andrew's Plaza
      New York, New York 10007
      Att: Patrick Egan, Esq.
         Assistant United States Attorney

**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

December 2, 2015

**Request to file under seal**

By hand delivery

Honorable Laura Taylor Swain
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street, Room 1320
New York, New York 10007

**Re: United States v. Samuel Waldman, 15 Cr. 139 (LTS)**

Dear Judge Swain:

I write on behalf of my client, Samuel Waldman, in advance of his sentencing on December 16, 2015. Mr. Waldman pled guilty to possessing child pornography, an undeniably serious crime. But there is no good reason to send him to prison. Instead, for the reasons to be discussed, I most respectfully urge the Court to sentence him to five years' probation.

## Introduction

At 52 years old and deeply respected in his Orthodox Jewish community as a scholar, teacher, and family man, this is Mr. Waldman's very first brush with the law. It has forever changed him. He is remorseful for his conduct, and ashamed before his family and his community. The media scrutiny that has accompanied this case has only heightened that profound sense of shame. The fact is that Mr. Waldman turned to viewing child pornography when he was at a low point personally and financially. Viewing media forbidden by his faith—including mainstream movies, music videos, and adult and child pornography—offered him an escape from his troubles and from what was a fairly repressive upbringing in a strictly religious household and culture.

Objective testing indicates, however, that he is not sexually attracted to young children and is not a danger to anyone. There is not the slightest suggestion that

Honorable Laura Taylor Swain  December 2, 2015
United States District Judge  Page 2 of 22

Re:  United States v. Samuel Waldman
     15 Cr. 139 (LTS)

he has ever engaged in any inappropriate contact with a minor, fabricated child pornography, or commercially distributed it. And, without minimizing the seriousness of his conduct, it bears noting that he has been held responsible for possessing only three illicit videos.

Mr. Waldman's misconduct was truly out of character for him. As numerous letters from those who know him best make plain, Mr. Waldman has lived an exemplary life marked by a devotion to his family and his faith. He is a kind and outgoing man who has impacted the lives of many.

From the moment of his arrest Mr. Waldman has accepted responsibility for his misconduct, and continues to do so at every turn. He is doing exceptionally well in counseling and has made great strides in understanding the root causes of his behavior. He is working hard to support his large family. And he has not viewed media of any kind, including, of course, child pornography, in almost two years.

Given Mr. Waldman's impressive characteristics, and given his keen remorse for his misconduct, the Court should look beyond the unreasonable Guidelines range and focus on the person Mr. Waldman has proven himself to be. A sentence of five years' probation is a serious one. Mr. Waldman would be closely monitored and subject to harsh sanction should he violate even a single condition. At the same time, Mr. Waldman will be required to register as a sex offender, an additional punishment that will impact him greatly.

Given his commitment to his faith, his willingness to address the issues in his life, and the overwhelming support of his family and community, Mr. Waldman is no threat to return to viewing child pornography, and no threat to violate the law in any way. Taking the § 3553(a) factors together, the Court should conclude that incarceration is unnecessary. The Court should instead impose five years' probation.

### Samuel Waldman's background

*A young man in a deeply religious household*

Samuel Waldman was born in 1962, in Brooklyn, to Fay Papernik and Herbert Waldman. Herbert had emigrated from Czechoslovakia on the eve of World War II. Fay, who was originally from Austria, had escaped to Switzerland during the

| | |
|---|---|
| Honorable Laura Taylor Swain<br>United States District Judge | December 2, 2015<br>Page 3 of 22 |

Re:  United States v. Samuel Waldman
     15 Cr. 139 (LTS)

war and stayed in a displaced persons camp until 1949, when she immigrated to the United States. Both Herbert and Fay were raised in the Orthodox Jewish faith; they raised Mr. Waldman and his three siblings in the same manner.

The family, including Mr. Waldman's grandmother, lived in a three-bedroom home in the Borough Park section of Brooklyn. Herbert was mainly self-employed. He patented numerous inventions related to the telephone answering machine. Fay worked as a secretary in a real estate office in Flatbush. The family was close-knit and happy.

The family's financial stability deteriorated when Mr. Waldman was 13, after a company Herbert worked for and held a large amount of stock in went into bankruptcy. Though the children had the basic necessities, there was little money left to spare. At that time, perhaps unsurprisingly, the family came to rely ever more heavily on its faith. Fay, influenced by a Jewish lecturer she had heard in the synagogue, banished television from the family home. Young Mr. Waldman was sent to a high school in Flatbush, the Mirrer Yeshiva, which had a strict regimen of Judaic studies and required synagogue attendance three times a day. Some days the students stayed for a night session until 8:30 p.m.

At that young age, Mr. Waldman made his best efforts to abide by the strict rules of his faith and his household. But, still a teenager, he was inclined to see them as little more than somewhat arbitrary restrictions. Indeed, while his family embraced the Orthodox faith, he struggled with the role it might play in his own life. Many of the activities that a typical adolescent boy would find appealing—watching television, reading secular magazines, and pursuing crushes, for example—were considered taboo. At times, Mr. Waldman chafed at the restrictions, and he partook of activities he knew were forbidden. Those various indiscretions were often followed by a deep sense of shame and guilt.

Mr. Waldman's parents sensed that he was possibly beginning to stray from his religion and so found him a mentor who might strengthen his faith. This mentor encouraged his parents to send him to a Yeshiva outside the city. Just before Mr. Waldman was to begin his senior year of high school, he transferred to the Yeshiva of Long Beach, a dormitory Yeshiva where students typically did not return home for a month at a time. There, he would come to embrace his faith in a way he had previously not thought possible.

Honorable Laura Taylor Swain  December 2, 2015
United States District Judge  Page 4 of 22

Re: United States v. Samuel Waldman
    15 Cr. 139 (LTS)

*Embracing the faith that would guide him throughout his life*

The first few months at the Yeshiva were difficult for Mr. Waldman. The Yeshiva's rules made him feel isolated; he was permitted to return home only once a month. In order to evade the prohibition on radio and music, he sneaked in rock tapes and hid them among the tapes of a famous rabbi's lectures. But soon something momentous happened: he actually began to listen to the rabbi's lectures. After a long day of studying and prayer, he would return to his dormitory and listen to them while having supper. Now free of the distractions of his home life in Brooklyn, Mr. Waldman was able to focus more than ever on Judaism and its teachings. He experienced a seismic shift in his understanding of his faith. The rabbi spoke passionately of the fundamental precepts of the religion. Mr. Waldman was enamored. He began conducting his own research and reading all the religious works he could find. He did not listen to the radio, watch television, or have any friendships with girls. Those things suddenly seemed unimportant and he accepted the fact that they were considered forbidden and spiritually degrading.

In 1980, Mr. Waldman graduated from the Yeshiva of Long Beach and began attending a Talmudic college program at the Yeshiva of Staten Island. After spending four years there, at 21 he transferred back to Mirrer Yeshiva, where he had previously attended most of high school. He studied at Mirrer Yeshiva's rabbinical college, deepening his knowledge of the Talmud, religious law, and ethics.

Two years into his studies at Mirrer Yeshiva, Mr. Waldman met his future wife, Shayna Appelgrad, through a traditional matchmaker. Shayna worked (and continues to work) as an eighth-grade Hebrew teacher at Beth Jacob in Borough Park, Brooklyn. At first, the union between Shayna and Mr. Waldman may not have been romantic in the traditional sense, but they had similar ambitions, ideals, and beliefs. After a couple of formal meetings, they decided to get married. Because of Orthodox Judaism's prohibition on pre-marital contact with the opposite sex, Shayna was the first woman that Mr. Waldman had ever even touched. Soon after their marriage, the young couple began having children. Still happily married today, they now have 13 children. Shayna has been steadfast in her support of Mr. Waldman throughout this case because she knows the kind of person he has been throughout their marriage.

Honorable Laura Taylor Swain  December 2, 2015
United States District Judge  Page 5 of 22

Re:  United States v. Samuel Waldman
     15 Cr. 139 (LTS)

Mr. Waldman continued to study the Talmud at a Kollel (an institute for Talmudic studies for married men) at Mirrer Yeshiva until 1989. He studied diligently for 8 to 10 hours a day. At the conclusion of his four years at the Kollel, Mr. Waldman was himself a rabbi.

While at the Kollel, Mr. Waldman decided he wanted to become a teacher. After he left the Kollel, he began working as a tutor and mentor at Yeshiva Mercas Hatorah in Belle Harbor. The school liked his work and gave him a position as a mentor and lecturer. After Mr. Waldman had spent six years there, however, the Yeshiva began to encounter financial difficulties and so he left to take a temporary teaching position at a Jewish elementary school in Bensonhurst, Brooklyn. After a year at that school, he secured a teaching position at Yeshiva Tifereth Moshe in Queens where he taught fourth grade for four years and seventh grade for seven years. Mr. Waldman taught the bible, the Talmud, religious law, and ethics.

*Mr. Waldman's work to support his growing family*

Mr. Waldman's family grew rapidly during the years he taught at the Yeshiva. In order to continue supporting his children, he sought additional work. In the mid-1990s, he founded L.D. Telebrokers, Inc., a company which resold lines for long-distance telephone calls. For five years, Mr. Waldman brokered telephone calls to foreign countries.

In 1999, Mr. Waldman's father passed away suddenly, at the age of 67, from complications from a foot infection. Mr. Waldman was devastated; he had always been very close to his father. For a year, in accordance with his faith's teachings, he led prayer three times a day in his synagogue. Mr. Waldman was depressed and under enormous pressure; the stress was beginning to take its toll. Eventually he saw a psychiatrist who prescribed him Zoloft for his depression and Propranolol, a beta blocker.

During many summers he worked at a variety of Jewish summer camps. He also spent his free time working on a book about Judaism: *Beyond a Reasonable Doubt: Convincing Evidence of the Truths of Judaism*. The book required a large amount of research and effort, and was published in 2002 by Feldheim

Honorable Laura Taylor Swain  
United States District Judge

December 2, 2015  
Page 6 of 22

Re: United States v. Samuel Waldman  
    15 Cr. 139 (LTS)

Publishers. The book was well received and many Jewish educational institutions around the country continue to use it as a teaching tool.

In 2002, Mr. Waldman closed L.D. Telebrokers after the government deregulated long distance phone calls, making the business unprofitable. He continued to work as a teacher, and started to work as a mortgage broker in the afternoons. He continued doing residential and eventually commercial mortgages until the financial mortgage crash. In 2004, his book publishers asked him to create a second edition of *Beyond a Reasonable Doubt* that would be more accessible to a secular audience. Mr. Waldman published this second version in 2005. Between the book sales, the mortgage business, and his teaching, things were going well for Mr. Waldman financially.

In 2007 he decided to leave teaching to pursue the mortgage business full-time. To this day, he regrets that decision for, soon after, the world financial markets crashed and Mr. Waldman lost almost all of his savings and was without his main source of income.

*A void in the wake of financial disaster*

Facing personal financial disaster, Mr. Waldman felt depressed and alone. The world was changing and things seemed hopeless. He had given up the career he loved in order to make a better living, but circumstances out of his control had left him with almost nothing. Business was basically non-existent at that point and he started spending long hours at home. Mr. Waldman was despondent and searching for an escape from his troubles. He began using the internet to watch movies on his laptop—a practice that was strictly proscribed in his faith. Late at night, while his wife was asleep, he would sneak into another room where he kept the computer. He particularly enjoyed watching movies that portrayed romantic relationships. This behavior slowly began to escalate, and Mr. Waldman soon found himself using the internet to view adult pornography in addition to mainstream movies—an egregious violation of his faith's teachings.

At the same time, under enormous pressure to keep his family afloat financially, he found work wherever he could. He experienced occasional panic attacks (he had been hospitalized twice for hyperventilating) and was again prescribed Zoloft (which he had stopped taking years earlier) and Lorazepam for his

Honorable Laura Taylor Swain  
United States District Judge

December 2, 2015  
Page 7 of 22

Re: United States v. Samuel Waldman  
   15 Cr. 139 (LTS)

anxiety. After exiting the residential and commercial mortgage business, he found part-time work at his neighbor's telephone company. After a few months, he secured a job as an English teacher at Yeshiva Ruach Chaim in Flatbush. After a year and a half at Ruach Chaim, he left because the school was not providing him with enough students to tutor. He began working as a used car salesman in Brooklyn, taking a small cut of whatever sales he made. He continued to tutor to supplement his meager income.

Constantly on the lookout for work, in September 2010 Mr. Waldman took a part-time position at Seminar L'Moros Bais Yaakov, a Hebrew college for girls. While teaching there he also took real estate classes and obtained his real estate license. He eventually found a part-time position at Gold Realty. In 2013 he left Gold to begin work at Schmidt Realty.

### Offense conduct

*An increasing amount of time on the computer leads to child pornography*

While things were just starting to slowly improve financially for Mr. Waldman and his family, he felt anxious and depressed and was continuing to spend a lot of time on the computer watching movies and pornography. As what can rightly be described as a progressive addiction grew, he gravitated toward more and more extreme subject matter to remain excited and engaged. Eventually, he encountered images of child pornography.

Child pornography became a part—a very small part—of Mr. Waldman's viewing habits. He estimates that child pornography comprised no more than about three to five percent of the media he consumed. Mainly, Mr. Waldman watched mainstream movies and adult pornography. He used a common file sharing program to download all sorts of videos and music.

In this way, the internet provided Mr. Waldman access to things that had long been off limits. This new world was exciting, but morally problematic. Mr. Waldman felt acute shame at violating his deeply held religious beliefs. He took steps to hide his behavior from his family and his community. He used a computer-cleaning program to delete the videos he had watched, but would then

Honorable Laura Taylor Swain  
United States District Judge

December 2, 2015  
Page 9 of 22

Re:  United States v. Samuel Waldman  
     15 Cr. 139 (LTS)

Nevertheless, certain items in the PSR's account of Mr. Waldman's statements to the agents warrant clarification, since, taken out of context, they are misleading and suggest that Mr. Waldman had a greater problem with child pornography that was actually the case. *See generally* PSR ¶ 13–17.

- Mr. Waldman's comments that he had a problem viewing pornography and that he became entranced while watching it pertained to pornography and various other forms of media *in general*, not child pornography specifically. ¶ 15–16.
- Mr. Waldman observed that it is taboo in his religious community to view *all* movies (and other forms of media) of any kind, not just child pornography. ¶ 15.
- Mr. Waldman said he would spend several hours downloading various kinds of movies, including mainstream movies, *not* pornographic movies. ¶ 17.
- Mr. Waldman never downloaded or viewed child pornography videos on his phone, only on his computer. ¶ 17.
- When Mr. Waldman is quoted as comparing viewing child pornography to jaywalking, he offered that comparison only to illustrate his hope that agents would decide not to arrest him despite his having committed a crime. He of course was not suggesting in any way that the two crimes were of equal magnitude. ¶ 17.
- Mr. Waldman said he could not put a date on when he started viewing adult pornography, not child pornography. ¶ 17.

**Psychosexual evaluation and testing results show Mr. Waldman is neither a pedophile nor a danger.**



Honorable Laura Taylor Swain  
United States District Judge

December 2, 2015  
Page 10 of 22

Re:  United States v. Samuel Waldman  
    15 Cr. 139 (LTS)



### Mr. Waldman's community and family have written the Court to demonstrate their support for him.

Mr. Waldman enjoys the staunch support of his family and community. They have stood by him even in the face of his rather public humiliation. Many of them have written letters on his behalf, which are attached here as Exhibit B.