Honorable Laura Taylor Swain  
United States District Judge

December 2, 2015  
Page 11 of 22

Re: United States v. Samuel Waldman  
    15 Cr. 139 (LTS)

There are many letters; we excerpt just a few of them here (and have arranged them first under Exhibit B) to provide the Court with a sense of the person Mr. Waldman has shown himself to be: a man deeply committed to his faith and rigorous in his beliefs, yet kind, compassionate, and forgiving towards everyone he encounters. As one fellow rabbi writes, "He goes about his business in the synagogue in a very humble way. He always speaks so nicely to everyone." Letter from Rabbi Yaakov Mordechai Weinfeld.

Mr. Waldman's wife writes that "Samuel is a caring and concerned husband and involved in my life. I discuss anything which is on my mind with him and I can always depend on him for good solid advice stemming from his common sense." Letter from Shayna Waldman.

One of his son's echoes those sentiments: "Any time that my father sees my mother getting a little overwhelmed or overworked he is always supportive and helps her out and makes sure she takes it easy. He stops whatever important things he's doing and takes over as much as he can … I never saw him say or do anything to hurt her feelings even a drop." Letter from Dovid Waldman.

One of Mr. Waldman's daughters writes of her "extremely loving, caring, and giving" father. Letter from Choni Waldman. She says, "[M]y father works hard to provide for our family, in an extremely honest manner. In general, integrity is one of my father's trademarks which he of course instilled in us as well." *Id.*

One of the characteristics most frequently cited in the letters is Mr. Waldman's generosity. A friend writes that Mr. Waldman's home "represents goodness, kindness and happiness … [the family] always let[s] people borrow their tools, shovels, car tire pump, or anything else they own." Letter from Itzy Eckstein. The Waldmans's next-door neighbors write, "Whenever we need something we know we can turn to the Waldmans. They have never let us down." Letter from the Lessers.

Many of the letters come from parents of campers with whom Mr. Waldman has interacted over the years. They know Mr. Waldman well and have wonderful things to say about him. For instance, one writes that "the concept of caring for other is such a part of his life that at camp he made sure every family got a note that let them know what items the Waldmans had that could be borrowed at any

Honorable Laura Taylor Swain  　　　　　　　December 2, 2015
United States District Judge　　　　　　　　Page 12 of 22

Re:  United States v. Samuel Waldman
　　　15 Cr. 139 (LTS)

time." Letter from Shaindy Appelbaum. Another writes, "As a father, I stand for the safety and wellbeing of my family; especially my children ... Rabbi Waldman [is] someone that wouldn't hurt a fly and certainly not a child...." Letter from David March.

A longtime friend sums up his feelings about Mr. Waldman like this: "My admiration of Samuel has not diminished at all even after 30 years. [] I looked up to him when I was young [and] today at 46, I still look up to him and admire him. He is a true friend." Letter from Zalman Green.

### Mr. Waldman has made impressive progress since his arrest.

Mr. Waldman took his arrest in this case very seriously. He has made great strides in the almost two years since. He has been completely compliant with the terms of his supervised release and has not incurred even a minor infraction. He has also not returned to viewing any media of any kind, including, of course, child pornography.



Honorable Laura Taylor Swain  
United States District Judge

December 2, 2015  
Page 13 of 22

Re: United States v. Samuel Waldman  
    15 Cr. 139 (LTS)



**The Court should sentence Mr. Waldman to probation.**

As this Court well knows, a district court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). Instead, a court must conduct its own independent review of the sentencing factors in § 3553(a) to determine the appropriate sentence. *United States v. Cavers*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). "In this way, the district court reaches an informed and individualized judgment in each case as to what is 'sufficient, but not greater than necessary' to fulfill the purposes of sentencing." *Id.* (citing § 3553(a)).

In addition to the Guidelines range, the § 3553(a) factors include, *inter alia*, (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need to promote respect for the law, provide just punishment, and protect the public from further crimes of the defendant; (4) the need for general and specific deterrence; (5) the need to provide the defendant with necessary treatment; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to victims. As will be discussed, these factors taken together counsel a sentence of probation for Mr. Waldman.

1. **The properly calculated Guidelines range is 41–51 months.**

We object to a four-level enhancement for "violent material" under U.S.S.G. § 2G2.2(b)(4). PSR ¶ 24. Significantly, after discussion between the parties, that enhancement was not included in Mr. Waldman's plea agreement. Without minimizing the child pornography on the three videos Mr. Waldman has been held responsible for, it was not particularly "violent" when compared to other

Honorable Laura Taylor Swain  
United States District Judge

December 2, 2015  
Page 14 of 22

Re: United States v. Samuel Waldman  
    15 Cr. 139 (LTS)

examples of child pornography, and so the enhancement is not appropriate. Absent that enhancement, Mr. Waldman's offense level is 22 (instead of 26), and his Guidelines range is 41–51 months.

### 2. The child pornography guideline is deeply flawed and recommends unduly harsh sentences.

In any event, the Court should accord the Guidelines range minimal deference. The Second Circuit recognized in *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010), that the child pornography guideline (§ 2G2.2) is "fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." Because the guideline's offense-level enhancements were added or augmented in response to Congressional mandates rather than empirical evidence, they "routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases." *Id.* at 186. Statistics published by the Sentencing Commission in 2009 demonstrate that most of the enhancements applicable to Mr. Waldman's case, for example, applied in the vast majority of cases: 94.8% involved images of a pre-pubescent minor, 73.4% involved images depicting violence, and 97.2% involved use of a computer. *Id.* at 186. Thus, an ordinary first-time offender is likely to qualify for an exceptionally high sentence "based solely on enhancements that are all but inherent to the crime of conviction." *Id.*

The guideline scheme thus creates "virtually no distinction" between the ordinary offender and sentences for the most dangerous offenders like, for example, producers and commercial distributors of child pornography. *Id.* at 187. The result is therefore "fundamentally incompatible" with the requirements of § 3553(a). *Id.* at 188.

The United Sentencing Commission agrees with *Dorvee*'s analysis:

> [A]s a result of recent changes in the computer and Internet technologies that typical non-production offenders use [including file sharing], the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability.... As a result, four of the of six sentencing enhancements in §2G2.2—those

Honorable Laura Taylor Swain  
United States District Judge

December 2, 2015  
Page 15 of 22

Re:  United States v. Samuel Waldman  
     15 Cr. 139 (LTS)

relating to computer usage and the type and volume of images possessed by offenders, which together account for 13 offense levels—now apply to most offenders and, thus, fail to differentiate among offenders in terms of their culpability.

United States Sentencing Commission, *Report to Congress: Federal Child Pornography Offenses* (2013), Executive Summary ii–iii. Thus, the Commission concluded that "the current non-production guideline warrants revision in view of its outdated and disproportionate enhancements" that fail "to distinguish adequately among offenders based on their degrees of culpability and dangerousness." *Id.*, Chapter 12, "Findings, Conclusions and Recommendations to Congress," 331. Unfortunately, § 2G2.2 has never been amended as the Commission recommends.

A brief history of § 2G2.2 is appropriate here. When the Guidelines were first enacted, simple possession of child pornography was not a federal crime. *See* Carol S. Steiker, *Lessons from Two Failures: Sentencing for Cocaine and Child Pornography Under the Federal Sentencing Guidelines in the United States*, 76 Law & Cont. Problems 27, 37 (2013) (detailing history of child pornography Guideline). The 1987 version of § 2G2.2 addressed receiving or trafficking in child pornography and set a base offense level of 13. From 1987 forward, however, this Guideline was repeatedly amended at the direction of one political branch of government, without the benefit of the Sentencing Commission's expertise, and often in direct contravention of the Commission's recommendations. *See Dorvee*, 616 F.3d at 184–86; Steiker at 37–41.

In a pattern that would be repeated over the coming years, Congress ignored the Commission's recommendations and instead directed the promulgation of ever harsher and more punitive Guidelines. *See Dorvee*, 616 F.3d at 185–86. Congressional amendments both increased the base offense level and added numerous enhancements. The result is an astoundingly harsh one-size-fits-all Guideline that has become untethered from empirical data.

Given § 2G2.2's problematic history and the Second Circuit's and Sentencing Commission's criticisms, the Court should afford the Guidelines range in this case the most minimal deference.

Honorable Laura Taylor Swain  
United States District Judge

December 2, 2015  
Page 16 of 22

Re: United States v. Samuel Waldman  
   15 Cr. 139 (LTS)

**3.   The remaining § 3553(a) factors counsel a sentence of probation.**

Guidelines range aside, the remaining § 3553(a) factors, taken together, counsel a sentence of probation.

### 3.1  Mr. Waldman's history and characteristics

We have discussed Mr. Waldman's impressive history and characteristics at length. He is a compassionate, generous man devoted to the wellbeing of his own family and the greater community. He is a respected scholar, author, and theologian who has counseled many others in their times of need. And, of course, he has no criminal record whatsoever—he'd never been arrested before this case. These impressive factors strongly support a non-incarceratory sentence.

### 3.2  The nature and circumstances of the offense

As we acknowledged at the outset of this submission, possessing child pornography is a serious crime. No one—including Mr. Waldman—would say otherwise. But there is not the slightest allegation that Mr. Waldman ever engaged in any inappropriate real-world conduct involving a minor. He did not, for example, fabricate child pornography. He did not commercially distribute it. Nor did he attempt to chat with any minors on the internet. The absence of any of those aggravating factors supports the argument that Mr. Waldman does not need to be imprisoned, and should instead be supervised on probation and allowed to continue in treatment.

### 3.3  Specific deterrence and incapacitation

Quite simply, Mr. Waldman is no threat to break the law again. He is certainly no threat to again possess child pornography. His impressive degree of self-awareness and willingness to confront his shortcomings is admirable. And he now keenly understands that there are serious *legal* consequences to possessing child pornography.

It is important to understand why someone like Mr. Waldman—who has lived a generally admirable life—turned to pornography in the first place. Dr. DeSantis explains that Mr. Waldman turned to pornography because, having grown up in

Honorable Laura Taylor Swain  
United States District Judge

December 2, 2015  
Page 17 of 22

Re: United States v. Samuel Waldman  
    15 Cr. 139 (LTS)

a culture with a fairly repressive approach to sexuality, "Watching adults engaged in non-restrictive sexual behavior went beyond a curiosity and became a release for suppressed thoughts and desires." DeSantis Report 14–15.

Mr. Waldman understands the role his upbringing may have played in his turn to adult pornography, and then to child pornography, and is working to address these issues. He has made substantial progress, and can continue to make more progress if his treatment regimen is not interrupted.

It bears noting here that Mr. Waldman had actually stopped viewing child pornography on his own, three months before his arrest. That he stopped on his own volition, and not because he found himself in legal trouble, is strong evidence that he will not return to viewing child pornography. Indeed, Mr. Waldman may not have understood the specific legal ramifications of his viewing child pornography, but he always understood that it was morally wrong as a violation of the religious principles that have guided his life and as an atrocity against its victims.

To the extent the Court is concerned that Mr. Waldman's offense of conviction indicates a risk of future child-molestation, the relevant scientific literature makes clear that there is no correlation. "[T]he empirical literature [] generally concludes that there is little—if any—evidence of a direct correlation between viewing child pornography and the viewer's commission of 'contact' sexual offenses." *United States v. Marshall*, 03 Cr. 557 (JZ), 2012 WL 2510845, at *2 (N.D. Ohio Jun. 29, 2012). Child pornography offenders also tend to have lower recidivism rates than other defendants. *See, e.g.*, Philip H. Witt, *Assessment of Risk in Internet Child Pornography Cases*, 11 Sex Offender Law Report 1, 14 (Dec./Jan. 2010) (summarizing recent recidivism research which yields recidivism rates of between 0.8% to 8% for child pornography offenders); Jérôme Endrass et al., *The Consumption of Internet Child Pornography and Violent and Sex Offending*, 9 BMC Psychiatry 43 (2009) (finding six-year recidivism rate to be 0.8% for contact offense and 3.9% for non-contact sexual offense).

It is also significant that as a result of his conviction Mr. Waldman will be required to register as a sex offender. That harsh collateral consequence—and overall humiliating experience—is another factor that contributes to his being

Honorable Laura Taylor Swain  
United States District Judge  

December 2, 2015  
Page 18 of 22  

Re: United States v. Samuel Waldman  
15 Cr. 139 (LTS)

specifically deterred. In short, he has more than learned his lesson, and does not need to be incarcerated to make the point any clearer.

### 3.4 General deterrence

The question of the role general deterrence should play in sentencing is a complicated one, to say the least. Deterrence is, after all, "a phenomenon that is notoriously difficult (and perhaps impossible) to measure." *United States v. Brady*, No. 02 CR 1043(JG), 2004 WL 86414, at *9 (E.D.N.Y. Jan 20, 2004). Evidence-based studies support the conclusion that it is the certainty of *apprehension* rather than the severity of the ensuing legal *punishment* that more effectively deters crime. *See, e.g.*, Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 202 (2013) (reviewing empirical deterrence studies and their attendant literature). Mr. Waldman's apprehension, felony conviction, and compulsory registration as a sex offender by themselves send a strong message to others who might be tempted to possess child pornography.

In any event, Mr. Waldman has contributed much more than his fair share to general deterrence. Indeed, upon his arrest he was subject to a kind of public shaming that most defendants charged with his offense never experience. Perhaps predictably, the arrest of a rabbi on child pornography charges incited a media firestorm. Mr. Waldman was featured in law enforcement press releases, saw his photo splashed across the internet, and had reporters hound him as he walked the streets. *See, e.g.*, Emily Shire, *The Brooklyn Rabbi and His Child Porn Collection*, The Daily Beast (May 21, 2014), http://www.thedailybeast.com/articles/2014/05/21/brooklyn-rabbi-busted-again-for-child-porn.html.

On a more practical level, law enforcement reported that the three videos found on Mr. Waldman's computer led to the arrest of 71 people as part of an investigation dubbed "Operation Caireen"—the largest-ever enforcement operation in New York targeting child pornography and related offenses. *See* Press Release, *HSI New York Announces Arrest of 71 Individuals for Sexual Exploitation Crimes Against Children in 'Operation Caireen'* (May 20, 2014), https://www.ice.gov/news/releases/hsi-new-york-announces-arrest-71-individuals-sexual-exploitation-crimes-against. Reinforcing the idea that the very public *arrest* of a defendant like Mr. Waldman, on its own, contributes to general deterrence, then-United States Attorney Loretta Lynch said at the time,

Honorable Laura Taylor Swain  
United States District Judge

December 2, 2015  
Page 19 of 22

Re: United States v. Samuel Waldman  
   15 Cr. 139 (LTS)

"The arrests and seizures announced today send an unequivocal message to those who engage in trading child pornography—if you exploit our children, and their abuse, you will be investigated and prosecuted to the full extent of the law." *Id.*

All of this means that, given the unique facts of his case, Mr. Waldman has contributed more to the principle of general deterrence than almost any individual defendant should be required to do. Because of him, the world has gotten the message that child pornography and related offenses will not be tolerated. The Court accordingly should determine that incarceration is unnecessary to further the principle of general deterrence.

### 3.5 The need to provide Mr. Waldman with appropriate treatment

Mr. Waldman requires treatment for mental and physical health concerns that he will be unlikely to receive if incarcerated. This factor therefore strongly counsels in favor of a non-incarceratory sentence.

As the PSR indicates, Mr. Waldman has been diagnosed with generalized anxiety disorder, obsessive compulsive disorder, and depression. PSR ¶ 51. He takes a raft of medications—in conjunction with his talk-therapy sessions—to help ameliorate these issues. *Id.* Nevertheless, as Mr. Waldman's therapist describes, he continues to struggle with them and was recently hospitalized for a panic attack. *See* Exhibit C.

His therapist notes the importance of Mr. Waldman continuing in treatment, and the debilitating consequences incarceration would visit upon him:

> His success is likely due to the combination of ongoing therapy and his family/community support. If he loses these sources of support, and is thrust into a challenging, restricting situation, such as incarceration, there [is] certainly a risk of him suffering ongoing panic attacks.

*Id.*

As for his physical health, Mr. Waldman suffers from elevated blood pressure and atrial fibrillation—an irregular and often rapid heartrate. Prison would

Honorable Laura Taylor Swain  
United States District Judge  

December 2, 2015  
Page 20 of 22  

Re: United States v. Samuel Waldman  
    15 Cr. 139 (LTS)

almost certainly worsen this condition, while affording inadequate treatment for it.

### 3.6 The need to avoid unwarranted sentence disparities

The Court need not sentence Mr. Waldman to prison to avoid unwarranted sentence disparities. A sentence of five years' probation would be in accordance with sentences handed out in similar cases.

As a general matter, many judges across the country impose substantially below-Guidelines sentences in child pornography cases. As for this district specifically, in appropriate cases—where, as here, the defendant is assessed to be a low risk for future crime and there are other mitigating factors—judges have not hesitated to impose noncustodial sentences. *See, e.g., United States v. Angelo Trinidad*, 14 Cr. 537 (NRB), (S.D.N.Y. June 23, 2015) (imposing probationary sentence); *United States v. Daniel Pinero*, 14 CR 341 (AJN), (S.D.N.Y. Apr. 1, 2015) (sentencing defendant to a non-incarceratory sentence despite a Guidelines range of 78–97 months); *United States v. Patrick Colon*, 12 Cr. 462 (VB) (S.D.N.Y. May 21, 2013) (sentencing defendant to time served of one day and five years' supervised release); *United States v. Christopher Ressa*, 11 Cr. 939 (RPP) (S.D.N.Y. Apr. 11, 2013) (imposing sentence of time served (around three days) and supervised release with advisory range of 78–97 months); *United States v. Robert Santana*, 10 Cr. 341 (SHS) (S.D.N.Y. Jan. 28, 2011) (imposing sentence of three years' probation and six months' community confinement with advisory range around five years); *United States v. Leonardo Morel-Baca*, 11 Cr. 427 (DAB) (S.D.N.Y. Oct. 2, 2012) (sentencing defendant with 78–97 months' range to time served of one day and supervised release); *United States v. Hector Garcia*, 10 Cr. 914 (BJS), (S.D.N.Y. Sep. 18, 2012) (sentencing defendant to probation); *United States v. Marvin Falikovic*, 07 Cr. 906 (NRB) (S.D.N.Y. Mar. 5, 2008) (sentencing defendant to time served and three years' supervised release); *United States v. John Balkam*, 05 Cr. 689 (DLC) (S.D.N.Y. Mar. 28, 2006) (sentencing defendant with 46–57 months' range to probation).

Most of these cases presented several aggravating factors such as chats, purposeful trading of images, or some indication that the defendant posed a risk to children. None of those factors is present here. Therefore, considering the circumstances of this offense and Mr. Waldman's personal history and