```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4            v.                        15 CR 139 (LTS)

 5   SAMUEL WALDMAN,
                                        Violation of SR
 6               Defendant.

 7   ------------------------------x

 8                                      New York, N.Y.
                                        October 23, 2018
 9                                      10:00 15 a.m.

10   Before:

11          HON. LAURA TAYLOR SWAIN

12                                      District Judge

13

14

15          APPEARANCES

16

17   GEOFFREY S. BERMAN
          United States Attorney for the
          Southern District of New York
18   MATTHEW J.C. HELLMAN
          Assistant United States Attorney
19

20   FEDERAL DEFENDERS OF NEW YORK, INC.
          Attorneys for Defendant
21   BY:  JONATHAN A. MARVINNY

22

23   Also Present:

24        ERIN WEINRAUCH – EDNY Probation Officer
          KRISTEN ALIPERTI – SDNY Probation Officer
25
```

1          (Case called)

2          MR. HELLMAN:  Good morning.  Matthew Hellman for the

3    government, with Probation Officers Erin Weinrauch and Kristen

4    Aliperti.  I apologize to the Court.  The delay is my

5    responsibility.

6          THE COURT:  Thank you.

7          Good morning, Mr. Hellman.  And good morning, Ms.

8    Weinrauch and Ms. Aliperti.

9          MR. MARVINNY:  Good morning, your Honor.  Federal

10   Defenders of New York, by Jonathan Marvinny, for Samuel

11   Waldman.

12         THE COURT:  Good morning Mr. Marvinny, and good

13   morning, Mr. Waldman.  Is there a member of your family here in

14   court today?

15         THE DEFENDANT:  Yes, my wife.

16         THE COURT:  Good morning.  Thank you for coming to

17   court this morning.

18         We are here today to address sentencing in connection

19   with Mr. Waldman's admission of specification 2 of the

20   violations of supervised release.  That specification charged

21   attendance at an event where Mr. Waldman was in the vicinity of

22   minors without the prior approval of the probation office.

23         I would like to ask the probation department to begin

24   today's proceedings by stating its view of the status of

25   supervision and the recommendation with respect to a sanction.

1          MS. ALIPERTI:  I would like to reflect for the record

2     Mr. Waldman's admission to the spec and the seriousness of it.

3     Since the last court appearance, with the religious holidays

4     there have been some attendance issues at treatment.  Some were

5     excused, some were not made up, the individuals, because a lot

6     of the holidays fell on his designated day.

7          I will add that since last appearance, especially with

8     the modification of the condition regarding the Internet

9     device, there continues to remain concern.  Mr. Waldman had

10    communicated that he maybe wanted to switch to a tablet that

11    his children would also have access to, and we had to remind

12    him that with this modification, which was implemented to

13    assist him with having a better understanding, there remains a

14    concern about a genuine understanding and appreciation for the

15    conditions.

16         Given all of that, we would still uphold the

17    recommendation of one week custody followed by 120 days, or 4

18    months, on the bracelet and a new 6-year term of supervised

19    release, which would be a continuation of the original

20    sentence.

21         THE COURT:  The 4 months on the bracelet, is that

22    location monitoring, GPS monitoring?  What is the type of

23    monitoring?

24         MS. ALIPERTI:  Location monitoring.

25         THE COURT:  Thank you.

1                    Mr. Marvinny.

2                    MR. MARVINNY:  Your Honor, may I speak from the

3      podium, please?

4                    THE COURT:  Yes, certainly.

5                    MR. MARVINNY:  Thank you.

6                    Your Honor, our position is that neither the offense,

7      the violation to which Mr. Waldman admitted guilt, nor any of

8      the other charged violations warrant prison time.

9                    I respectfully ask the Court to consider that this is

10     the very first time Mr. Waldman is being sentenced for a

11     violation of his supervised release.  These were all grade C

12     specifications.  Mr. Waldman has admitted guilt to one.  I dare

13     say frequently defendants on their first violation who have

14     been only charged with and convicted of grade C specifications

15     are not sent to prison as a matter of course.

16                    None of this, your Honor, is to say that the conduct

17     is not serious or that it doesn't merit sanction.  The

18     probation office is seeking, after a prison term, a period of

19     location monitoring, GPS monitoring.  That is certainly the

20     kind of very serious restriction on Mr. Waldman's liberty and

21     freedoms that the Court could impose in lieu of prison time.

22                    I just don't think Mr. Waldman, given his situation,

23     given his conduct, and given his real efforts to improve since

24     these violations were filed deserves prison time.  The Court

25     can impose something short of prison that is still a

5

1    punishment, that doesn't take him away from his family, take

2    him away from his job, take him away from his religious

3    obligations.

4         I would also ask the Court not to lose sight of the

5    fact that the big picture here is in many ways good.  Mr.

6    Waldman's last polygraph examination was in June, and it

7    showed, quote, no significant responses.  That was a positive

8    polygraph examination.  Since then he has been attending

9    treatment.

10        I was given a letter -- I know the probation office

11   has the same letter -- that I think was just referenced

12   updating us on Mr. Waldman's participation.  Yes, he has missed

13   some sessions because of the religious holidays.  But the

14   therapist's report said -- I'm going to read it.  It's a very

15   short paragraph.

16        "Mr. Waldman is an active participant in group where

17   he has been addressing pertinent issues, such as thinking

18   errors, high-risk factors, and triggers that pertain to his

19   offense cycle."  He has been described as an active

20   participant.  He is not someone phoning it in, for lack of a

21   better term.  He is going and doing work.

22        Also, I think really important here, your Honor, is

23   Mr. Waldman has not returned to viewing any pornography

24   whatsoever since he was released in this case after his initial

25   sentence, much less viewing any child pornography.  Nor has he

1    committed any crime, no crime at all.

2          He is charged with grade C specifications, which we

3    admit are serious.  But again, in the grand scheme of things,

4    in the big picture, the record isn't terrible.  It is not a

5    record that warrants prison time.

6          The offense he pled guilty to was not informing his

7    probation officer where some children who hadn't been

8    identified previously showed up at the bris of his grandson.

9    This is a festive event, a religious event, an event involving

10   Mr. Waldman's close family.  It is what it is.  He erred in not

11   doing that, he has accepted responsibility for it.

12          It is part of a history of things that have been

13   brought up to this Court before, that Mr. Waldman has a large

14   family, extensive religious obligations.  A lot of the

15   violations here that are included in the paperwork come from

16   those kinds of things.

17          There was an issue about the no deliberate contact

18   provision.  The probation office and I went back and forth.  We

19   then sought clarification from the Court.  The Court made the

20   Court's views very clear.  We changed the language.  Since

21   then, even since before then, there has been no additional

22   violation.  Mr. Waldman hasn't had his friends' children over

23   to his apartment.  He hasn't had an incident like the one that

24   occurred back in May at his grandson's bris.  So he has really

25   shown that he has attempted to comply.

1          It's been tough for him to navigate his life with the

2     very serious restrictions that are in place because of

3     supervision.  That's how it should be.  Those conditions are in

4     place for a reason.  They are in place both to protect the

5     public, obviously, to make Mr. Waldman conform, and help him

6     grow as a person.  He has to adapt.

7          It was hard for him and it hasn't always been perfect,

8     but from my point of view he has made efforts to comply, he has

9     tried to get better.  When the law and the rules have been

10    explained to him clearly in a way that he grasps, he has

11    attempted to follow them and he has made progress.  We

12    shouldn't lose sight of that either.

13         Your Honor, I'm not asking you to commend Mr. Waldman.

14    I'm asking you to see a man who is trying, has not been perfect

15    but is improving, who is going to continue to improve, and has

16    already shown in the course of these proceedings, which have

17    been exceptionally stressful for him, that he is willing to

18    modify his behavior to conform.  I think he is worth giving

19    another chance.

20         Prison, even the short term the probation office is

21    recommending, is a very serious sanction for a man with such a

22    large family and responsibilities and work.  We are asking you

23    to impose a sentence short of prison that the Court thinks is

24    adequate to address all the sentencing factors.

25         It is my fervent hope that you will never see us here

1    again, your Honor, at least not on this case, at least not for

2    any negative reason.  I think he has demonstrated enough

3    compliance that it is worth sparing him prison time at this

4    point, imposing some other sanction, and giving him a chance to

5    show he can do better.

6              THE COURT:  Thank you.

7              MR. MARVINNY:  Thank you.

8              THE COURT:  I will offer Mr. Waldman an opportunity to

9    speak.  I will first ask if Mr. Hellman wishes to be heard.

10             MR. HELLMAN:  Please, your Honor, and briefly.

11             I think the position of the office of the United

12   States probation is eminently reasonable given the

13   circumstances.  Mr. Marvinny's points are well taken.  But even

14   in the time since we were last before the Court, there were

15   missed sessions.  There are still questions about Internet-

16   accessible devices.

17             Specifically, since the last time we were here, which

18   was within the last six weeks, I believe, there were three

19   missed sessions.  This is important because the violations,

20   which are grade C violations, consist of areas of slippage

21   between what the responsibilities of a supervisee are and how

22   those obligations are being met.

23             It appears that there is an inability to fully adopt

24   the position of the office of probation and the strictures of

25   the Court that have been imposed while on this period of

1    supervised release.  As counsel stated, they are in place for

2    reasons that, frankly, cannot be more important.

3         So, while they represent grade C violations, they

4    represent in certain ways death by a thousand cuts, where the

5    obligations of the supervisee are not being met and are

6    constantly a source of back-and-forth between the officer

7    responsible for supervising Mr. Waldman and Mr. Waldman.

8         Those terms have been clarified.  They are now spelled

9    out in even greater detail than before.  And they are really

10   unmistakable, what the rules and responsibilities of the

11   supervisee are.  But Mr. Waldman has not met them.

12        So, a period of incarceration which is brief is

13   merited in this case to absolutely underscore that, yes, we

14   expect no future violations, there can be no future violations.

15   Mr. Waldman should not be before the Court ever again on this

16   or any other criminal matter.

17        There also needs to be emphasis placed on the past

18   violation, which has been admitted, which will suit the

19   supervisee or assist the supervisee in meeting all the

20   conditions, maintaining safety in the community, and seeing

21   that those 120 days on electronic supervision, if imposed by

22   the Court, are totally uneventful from the perspective of the

23   office of probation.

24        Thank you.

25        THE COURT:  Thank you.

1         Mr. Waldman, before I invite you to speak, I am going

2    to ask a couple of questions for clarification of the probation

3    officers.

4         One is as to the electronic location monitoring.

5    Would that be combined with particular hours of permission to

6    be in and out of the house, or is it simply a matter of being

7    able to know where he is, which I think would be GPS I'm

8    suspecting?

9         MS. ALIPERTI:  Your Honor, as you may recall, Mr.

10   Waldman's original sentence involved 12 months of home

11   detention based on electronic monitoring.  The probation

12   department would request that same level of monitoring, which

13   is location monitoring.

14        He would be allowed out for work, religious purposes,

15   and any other time-outs that are approved by the probation

16   department.  Other than his normal scheduled events, for which

17   he would provide us a schedule, for anything else he would have

18   to require permission, and he would expect to be only at the

19   locations that he is approved to be at during those times.

20        THE COURT:  Thank you.  The second question is if I

21   were to impose a sentence of incarceration, do you know whether

22   the MCC, for instance, has a kosher catering facility or how we

23   would handle the dietary restriction issues?

24        MS. ALIPERTI:  I emailed with the liaison from the

25   MCC, who detailed that both the MDC and MCC offer a kosher

1   option for food.

2           THE COURT:  Thank you.  Would it be a matter of

3   reporting as directed by the probation department or would I be

4   setting a particular week?  I have not dealt with this short

5   period of time before, so I would like us all to know what you

6   would anticipate what the logistics would be.

7           MS. ALIPERTI:  Yes, your Honor could set a surrender

8   date if you felt that was necessary.  We had said what our

9   recommendation was for the custodial term at the last court

10  appearance, hoping that in preparation for today Mr. Waldman

11  would get his affairs in order before that time.  If your Honor

12  was inclined to remand him today, we would set a date where he

13  could surrender directly to the facility or to the marshals

14  here, and they would transport him.

15          THE COURT:  Thank you.

16          Mr. Waldman.

17          MR. MARVINNY:  May he use the podium?

18          THE COURT:  Yes.

19          THE DEFENDANT:  There are a number of points.

20  Interestingly enough, I'd like to bring out the point that was

21  just brought up by Ms. Aliperti, which was shocking to me, two

22  points, and both of them were totally false.

23          For instance, I took off sessions for religious

24  holiday, which of course were allowed.  I have no days that I

25  was supposed to make up.  If I was supposed to make up, I would

1    have been told by Ms. Aliperti or my therapist that these are

2    your make-up days, and then, had I not gone to those days, I

3    would recall missing the session.

4           None of that happened.  There was no contact with me

5    that I am required to make up any of those missed days.  So I

6    did not miss any sessions whatsoever.  Nothing was spoken to

7    me, emailed to me in any way, shape, or form.  That was an

8    outright lie, literally, where their made-up story made me look

9    bad.  Step one.

10          Step two, I have been begging for a cell phone that

11   has no Internet access whatsoever, a cell phone with no

12   Internet access.  We have been going back and forth about this.

13   It's still in the middle.  There is such a thing in the

14   orthodox community.  They have such setups where they

15   especially remove the Internet because they don't want kids

16   getting ahold of it, whatever.  This has gone back and forth.

17          Finally, Ms. Aliperti said, I don't think it is going

18   to work, maybe look into a tablet.  I said tablets are too big,

19   etc.  Finally, I said, maybe I found a small tablet.  Again, I

20   did not want a tablet.  I was strictly looking for an

21   email-only capable phone, that's it, no Internet.  Now she

22   takes it and turns it around on me and says, oh, and you wanted

23   to get something that your children may be able to that ahold

24   of.

25          By the way, had I gotten a tablet, I would have done

 1    the exact same thing with that tablet, had removed the

 2    Internet.  Even though you don't have to, it can be monitored

 3    by the monitoring software system.  But I do not do that.  I

 4    remove it because I have children and for myself I do not want

 5    Internet access.  All I need is email for my business.  So that

 6    was a totally inaccurate and again making me look bad.  There

 7    are a lot of things that they have gone out of their way to

 8    really make me look bad.  That just came up now, so I had to

 9    bring it up.

10            The two points and my main focus --

11            THE COURT:  May I ask you something so that I'm clear.

12    This non-Internet-capable phone, what you are thinking of is

13    something that has more features than a flip phone because you

14    want to be able to have email on the phone?

15            THE DEFENDANT:  Correct, but no Internet.  There's a

16    special thing where they set it up where there is no Internet

17    access possible whatsoever, strictly all you can get is email,

18    that's it.  That's a very popular device in the community.

19    Whether it will be allowed eventually or not, we are still

20    looking into it and speaking to various people in the PO

21    department, etc.  That was my main desire.  I wanted it at the

22    time.

23            When we did discuss the tablet, she threw right back

24    at me, oh, look, you have to be careful with the children.  I

25    didn't want the tablet.  Even if I had it, I would remove the

1    Internet access on the tablet.  You can do the same thing with

2    a tablet as with a cell phone.  The problem with the tablet is

3    it is just too big for me.  It's like this size as opposed to a

4    cell phone.  I just want to be able to access my email on the

5    road wherever I am.

6             THE COURT:  Thank you.

7             THE DEFENDANT:  My main point I want to bring out is

8    that I have not been defiant in any way, shape, or form.  I

9    will bring up the two main points that have been brought up and

10   show that I have been trying very hard to work with the system.

11            There have been times when things were not clear.  The

12   direct contact, the deliberate contact, which we will talk a

13   lot more in a moment, that was always a very unclear point.  As

14   soon as it became very clear that Ms. Aliperti really was

15   putting her foot down -- we may have other interpretations that

16   we could eventually get to court and make sure -- that you just

17   can't have kids over, immediately I told my therapist, cold

18   turkey, there ain't no kids coming over to my house, finished,

19   I accept it 100 percent.  As difficult as that is, it's too

20   bad, this is the way we're doing it.  It's difficult for my

21   wife, my kids.  Tough.  These are the requirements.

22            Going back to when that child came over and stayed

23   overnight, which I know is an issue.  It was an emergency call

24   to my wife.  My wife is here.  She is ready to testify under

25   oath to whatever I say now.  I'm ready to testify under oath as

1    well.  Emergency call.  A parent called me.  They have to go

2    out of town, and they asked a favor, for the kid to stay over.

3    This was approximately December-January time, going way back.

4    At that point my wife said okay.

5          Why did she say okay?  My wife can testify that I do

6    not even say hello to children who come to the home.  I don't

7    say one word.  You would think that they don't exist, literally

8    don't exist.  I'm not a social type of parent with thousands of

9    hours with kids.  Nothing.

10         I go to the front room.  I have an office.  I do not

11   even say hello.  I'm not saying it is the right thing to do or

12   not, but it's a fact.  Zero contact.  It is not a question of

13   deliberate.  It's zero.  It's not indeliberate.  There is no

14   contact whatsoever.  My wife is very well aware of that.

15         This was an emergency.  The parent is calling.  We

16   have questions about what "deliberate contact" means.  She

17   allowed the child to come over to sleep over.  That's what

18   happened.  Later she notified me.

19         Believe me, I wasn't happy about this, but it happened

20   already.  It was an emergency and they had to go out of state.

21   It happened.  Trust me, I have nothing to do with kids that

22   come to my home.  But that is what happened.

23         So this wasn't a defiant let kids come over and sleep

24   over.  It was a circumstance that happened.  Unfortunate.  We

25   maybe should have been more careful.  The point is I am not

1   defiant.

2          It's not that I don't care or whatever.  It's not

3   true.  I have not missed sessions.  I have not missed any

4   sessions without permission the whole time for two years now.

5   And wherever I had to make up a session, every single time I

6   did.  That can be checked up with the office, with the

7   therapist's office.

8          That is with the child staying overnight.

9          The other thing I want to address, I have addressed it

10  a number of times but it is something that again I want to show

11  I'm not defiant.  I was allowed a number of times to go to

12  various family celebrations before this bris.  Ms. Weinrauch

13  knew I had a bar mitzvah, and she made sure that the rabbi in

14  charge of the children there was aware of the situation.  My

15  father-in-law was there.  Trusted adults were aware of the

16  situation so as to keep an eye on me.  Eric was the PO.  No one

17  ever told me if any other minor walks in, I have to walk out.

18         I had a bris two weeks ago.  Ms. Aliperti -- and I

19  appreciate that she did this, but even she backed off from

20  that -- she herself just made sure that there was adult

21  supervision.  She did not tell me again that if a minor walks

22  in, I have to step out.  I appreciate that.  But that was a

23  little overstepping on the boundaries.

24         I didn't mention this last time.  It is forbidden,

25  according to Jewish law, it your prayers it is a sacrilege to

1    go out and get on your cell phone.  You are just stepping all

2    over the law.  You can't go out in the middle and start making

3    phonecalls, this is a medical emergency.  You don't make

4    phonecalls in the middle of prayers.  I'm told to leave in the

5    middle of prayers and go out and start talking.  You're not

6    allowed to.  It will look ridiculous, and it's against Jewish

7    law, literally.

8            THE COURT:  I thought you had told me, correct me if

9    I'm wrong, when you were here last time and described the

10   circumstances of the bris, you had said that you arrived and

11   you saw these other children there and nonetheless stayed.

12           THE DEFENDANT:  Correct.

13           THE COURT:  It did not sound to me as though the

14   service and the prayers had commenced and it was a question of

15   you interrupting -- let me finish, thank you -- interrupting a

16   service and leaving.  Those are different things, going into a

17   situation and engaging in a situation as opposed to not going

18   into the situation at all.

19           THE DEFENDANT:  I agree a hundred percent with your

20   Honor, of course.  Nevertheless, there are a lot of

21   similarities.  Unfortunately, I was late.  There is only one

22   prayer going on over here, and I am late as can be.  I'm

23   running in.

24           To start leaving and start making phonecalls, it would

25   also be really questionable.  But part of the things were that

1   had more minors showed up in the middle of the thing, I would

2   have to make another phonecall, so to speak.

3           What I'm bringing out --

4           THE COURT:  You didn't --

5           THE DEFENDANT:  What I did was wrong.  I'm not saying

6   it was right.  What I'm bringing out is it was difficult, very

7   difficult circumstances to be able to totally comply.  I just

8   mean it wasn't defiant.  It was a situation that was extremely

9   difficult.  Not like I couldn't care less and I'm defiant, I'm

10  thumbing my nose at the system.  It's never been that way,

11  ever.

12          I have been off my anxiety pills for 7 months.  I went

13  back on them now because the anxiety I have been under these

14  past three hearings has been quite a lot to me.  I know it may

15  sound like a short-term.  It's devastating, really devastating.

16  I have so much going on.  It is very difficult not to be around

17  for a week and not to tell anybody and the family and the work,

18  and then four months observation.

19          This has been a punishment, a serious punishment.  As

20  far as my compliance, I learned the hard way that when in

21  doubt, if you have any doubt, you must get in touch with the

22  probation officer.  That is what I intend to do.

23          I have been talking with her about the cell phone back

24  and forth.  I wouldn't dream of buying it until we have come to

25  a conclusion.  This is the message I'm trying to convey.  It is

 1 | not a case of defiance, it is not a case of not taking this

 2 | seriously.  It's just there were certain circumstances that do

 3 | not happen every day.

 4 | I can say in my group one guy got a phone with porn on

 5 | it, another guy had a phone with Internet on it.  I didn't

 6 | dream of getting that.  That is not in my dreams.  I have not

 7 | watched any media for over four and a half years in order to

 8 | keep away from the whole mess.  Nothing, no media, period.

 9 | Forget about porn.  I am trying to be careful and making sure

10 | not to regress and not to offend.

11 | Thank you for listening.

12 | THE COURT:  Thank you, Mr. Waldman.

13 | Ms. Aliperti, you have been accused of lying.

14 | MS. ALIPERTI:  Yes.  To clarify what AUSA Hellman had

15 | said, he was excused on the Mondays.  What was relayed to me in

16 | regards to treatment was his therapist did make an attempt to

17 | schedule him another day that week, meaning he could be excused

18 | on Monday, because no one wanted to interfere with his

19 | religion.

20 | But the individual session, in which there is more

21 | flexibility -- as a group, it is tough to reschedule multiple

22 | people -- there was an attempt made to redo what happened on a

23 | different day.  He had informed them that his schedule between

24 | work, prayer, would not allow him to reschedule.

25 | Because the religious holiday is an excused absence,

 1    there were some attempts made.  If he says no and if he can't

 2    fit into the therapist's schedule, that's why there was an

 3    absence for the other days that they attempted to reschedule.

 4           In regards to the cell phone, what Mr. Waldman is

 5    discussing -- Tag is a software.  I have done due diligence and

 6    I have spoken to whomever we needed to.  It is a software that

 7    they put onto a phone to remove certain capabilities.  They

 8    could pick choose what app.

 9           Unfortunately, which was relayed to Mr. Waldman,

10    because it is a software, any individual can factory reset

11    their phone on any day and the software is removed.  That will

12    not go with the computer monitoring because if Mr. Waldman

13    factory resets his phone, he can have a browser back, do

14    whatever he wants, and we would be none the wiser unless we

15    were checking his phone daily to make sure.

16           I spoke to Tag.  Tag said absolutely, people have

17    reset the phone and have gained access.  Therefore, just

18    removing the browser to get Internet capability will not work

19    in regards to the computer monitoring.

20           What Mr. Waldman is referencing about the tablet, in

21    the Eastern District, due to resources, we do not monitor

22    smartphones.  We had suggested a Windows-based tablet which is

23    much smaller than a laptop and more portable, can be monitored

24    at its full capacity.  Meaning he would have a browser and be

25    able to look at Google and we would know exactly what he was

1    doing.

2          Where the issue with the children came up, when Mr.

3    Waldman and I were discussing it, he had emailed me about the

4    tablets, saying that he had found one that was smaller, and he

5    was assuring me that he would get it tagged, which was what we

6    were discussing before, put the software on it, for his

7    children's school purpose.

8          That's what prompted me to say, Mr. Waldman, if you

9    remember, we had amended your conditions to show that you are

10   the only person who can access and have control, possess, and

11   use your device.  There were emails back and forth.  We were

12   reiterating the point.

13         I did not make up that he was buying the tablet for

14   his children.  He was relaying that as part of having a tablet,

15   he would implement the Tag for his children's school purposes.

16   That's why I had then clarified to make sure again we weren't

17   getting him into a pickle in terms of having devices or letting

18   people access them that he shouldn't have had access to.

19         Two issues about the bris.  The reason why Mr. Waldman

20   was permitted to go to the bris this time was, again, I had

21   spoken to multiple people.  There were at least three people.

22   I spoke to the rabbi, his father-in-law, his children were

23   there, his wife.  Again, the circumstances were told us there

24   were going to be no other minors except for Mr. Waldman's

25   family members, who were all fully aware of his offense with

1    the addition of the responsible adult.

2          If that has changed, we were unaware of that to this

3    day.  We were operating, like the prior bris, that it was a

4    ceremony just with family, and if there were changes, he would

5    have needed to let us know that accordingly.

6          In hearing Mr. Waldman speak, when he says he is not

7    defiant and that as soon as the contact with minors was

8    explained to him, he stopped cold turkey, that is false.  I

9    have had to explain to him multiple times that he cannot have

10   contact with minors, so much so that at the last time when this

11   issue was discussed, I had him come in, sit in front of me, and

12   read his judgment to me to make sure he understood, because it

13   was still happening.

14         He was going to therapy saying so-and-so came over

15   after I would say to him you can't have contact with minors.

16   So it wasn't a one-and-done cold turkey.  We wouldn't be here

17   today if he was in compliance and was doing what he was

18   supposed to and it wouldn't have been a further issue that

19   needed to be addressed.

20         MS. WEINRAUCH:  Your Honor, if I could say one thing

21   also.  I was the original supervising officer of Mr. Waldman in

22   the Eastern District.  These issues that are coming up today

23   with the cell phone and with the contact with minors are all

24   issues that we have been discussing here in court and during my

25   term of supervision with Mr. Waldman.  This is repetitive

 1   behavior that has not stopped despite location monitoring, home

 2   confinement, being placed in the halfway house as a result of

 3   the sentence on the offense.

 4          That is why the probation department is requesting the

 5   custodial term, because these instances have continued and Mr.

 6   Waldman has secured cell phones without permission that have

 7   had Internet on them.  Whether he knew that before he got them

 8   or not, this has been a repetitive behavior of all these

 9   noncompliances, and that is where we come from today with our

10   recommendation.

11          THE COURT:  Thank you.

12          Mr. Waldman.

13          Did you want to speak with Mr. Waldman before he

14   speaks further, Mr. Marvinny?

15          MR. MARVINNY:  No.

16          THE DEFENDANT:  I would like to challenge and make

17   true this case.  I would like to challenge Ms. Aliperti to show

18   any contact with the therapist and myself with any of those

19   missed sessions.  I promise you you will not find a single

20   contact -- not a phonecall, not a text, and not an email.  None

21   whatsoever were made to me about redoing a missed session.

22          I recall Victoria emailing Ms. Aliperti during the

23   last session telling her all the times that I need off.  I told

24   the therapist with holidays and everything.  There very well

25   may have been discussion between them about maybe rescheduling.

1   Not a word, not a text, not an email, not a phonecall.  I

2   challenge the Court to find this was said to me, period.  That

3   is one thing.

4          The second things is I have the email that shows not

5   what Ms. Aliperti just said.  That is, I have the email showing

6   that I openly said that the other side of the family does not

7   know about my situation and they may be bringing children,

8   minors.  I have that email.  So she was well aware of it.  It's

9   in the email.

10          Nevertheless, she was kind enough, since the rabbi was

11   keeping an eye on me and my father was keeping an eye on me,

12   those were the two official phonecalls that were made: you have

13   to be careful, even if you go to the bathroom, be careful.

14   That I was totally compliant with.  To say it was different is

15   not true.  I clearly wrote an email.  She asked me will there

16   be other ones, and I answered her the truth: yes, the other

17   half of the family will be bringing minors to that.

18          THE COURT:  Would you read that email?  You have it

19   there?

20          THE DEFENDANT:  I don't have it here.  I didn't know

21   this was going to be brought up.  I have it at my house.  She

22   should have it in her emails also.  These are open things that

23   we can easily prove.

24          THE COURT:  What I will say with respect to the

25   sessions is that since there is a dispute as to the specifics

25

1    of the interactions regarding the sessions, the question of not

2    making up sessions in relation to the recent religious holidays

3    will not form any part of the basis of my decision as to the

4    sanction.  So it's not necessary to have a hearing.

5         THE DEFENDANT:  With the cell phone there was one

6    instance.  That was another violation.  We went through this

7    last time.  I was as careful as can be.  I have all the Amazon

8    clippings and we have all the questions that you asked on

9    Amazon.  You asked the people about it.  These are not owners

10   of it.  These are people who bought it, and they respond, like

11   the group thing, and they tell you about the cell phone.  They

12   all said it's a dumb phone.

13        The second I got it and I saw it was not a dumb phone,

14   I went to two sites, totally kosher sites, saw, uh-oh, there is

15   a possibility of seeing a figure.  I immediately stopped.  I

16   notified.  This went to forensics, which came back clear

17   showing that it was exactly the same I said, that I did not go

18   anywhere.

19        It was a misjudgment.  I should have been maybe more

20   careful.  But these are not things that you throw the book at a

21   person for.

22        THE COURT:  But you were not supposed to get it at all

23   without prior approval.

24        THE DEFENDANT:  True if there is Internet.  If there

25   is no Internet, that is technically the main issue.  I was

1   under the impression there was no Internet.  As soon as I saw

2   it was incorrect, I did not use it, period.  I told my

3   therapist the next day.  That was Saturday night–Sunday.

4   Monday morning 10 a.m., 10:30, I told me therapist what

5   happened.  This is not a person who is defiant and doesn't care

6   and is hiding and trying to get away.  I told her.  No one

7   forced me to.

8          I told Ms. Aliperti next day, she asked me, were there

9   minors there?  I could have lied.  Who is going to know the

10  difference?  I told her straight out, yes, there was, and I

11  apologized to her.  I came down here and apologized.  I just

12  tried to explain to her it was an impossible situation.

13         This is not a person who is defiant, doesn't care, and

14  he is getting around things.  I am not that person.  I have

15  been trying to do my best.  These have been difficult

16  circumstances, some mistakes here and there.  But believe me I

17  have learned very much over these past few hearings.  I do not

18  have to be punished.  I have been punished.  I'm telling you,

19  I'm back on anxiety pills.  It's not good.

20         THE COURT:  Thank you, Mr. Waldman.

21         Will you all sit quietly for a few minutes while I

22  reflect on everything that I have heard and make my decision.

23              (Continued on next page)

24

25

1           THE COURT:  Thank you for your patience.  I have

2    considered very carefully everything that has been said here

3    today, all of our prior sessions and interactions as well, and

4    I have considered the remarks and factual proffers and events

5    in light of the relevant sentencing factors for a supervised

6    release violation as set forth in Section 3553(a) of Title 18

7    of the United States Code and 3553(c).

8           Mr. Waldman has made progress with his therapy and his

9    understanding to some degree of the changes that are necessary

10   in his day-to-day life, and I commend him for that, but the

11   road that brings us here today has been one of resistance.  I

12   am not using the word defiance.  That is a word that

13   Mr. Waldman has used, but that's not my word.  But I do use the

14   word resistance to supervision, and a pattern of

15   rationalization of noncompliance after multiple instructions by

16   the probation department as to what is required by conditions

17   that I set out very clearly at the original sentencing.

18           I find that there is a need to promote deterrence and

19   respect for the terms of Mr. Waldman's sentence by

20   demonstrating that a major consequence of the crime of which he

21   was convicted is that the sentence restricts the way he

22   interacts with his community, which includes many children.  I

23   find that Mr. Waldman must experience true physical separation

24   from that community for a short period of time.

25           The Court's accommodation of his request that his

 1   original sentence be served in a halfway house with furloughs

 2   for observance in his religious community did not accomplish

 3   apparently this essential purpose of the sentence, nor did the

 4   earlier period of home detention sufficiently accomplish that

 5   purpose of the sentence and the restrictions that have been

 6   imposed.

 7          The Court's goal in imposing the sentence that will be

 8   imposed today is that Mr. Waldman will be sufficiently attuned

 9   to the requirements of his supervised release by the sanctions

10   imposed in this proceeding, that he will be compliant and

11   entirely worthy of the Court's trust going forward, and that

12   will also support and promote his continued healing and growth

13   into new internal attitudes completely and a new and

14   appropriate relationship with the community including the

15   children in the community.

16          I will now state the sentence that I intend to impose.

17   Mr. Waldman and Mr. Marvinny, would you please stand.

18          Mr. Waldman, it is the judgment of this Court that you

19   are to serve seven days of imprisonment, to be followed by a

20   six year term of supervised release.

21          So, to be clear, I am revoking the current term of

22   supervised release, imposing a sentence of seven days of

23   imprisonment and reimposing a six year term of supervised

24   release to follow that, which will include four months of home

25   detention with location monitoring.

1          All of the prior mandatory standard and special

2    conditions as modified until today will be reimposed as well.

3          The location monitoring and home detention condition

4    will be as follows:  You must comply with the conditions of

5    home detention for a period of four months.  During this time

6    you will remain at your place of residence except for

7    employment, religious observation and other activities approved

8    by your probation officer.  You must maintain a telephone at

9    your place of residence that does not have call forwarding, a

10   modem, caller ID, call waiting or portable cordless telephones

11   for this period.

12         At the direction of the probation officer, you shall

13   wear an electronic monitoring device and follow electronic

14   monitoring procedures specified by your probation officer.  The

15   home detention shall commence on a date to be determined by the

16   probation officer.  And you must pay the cost of home detention

17   on a self payment or copayment basis, as directed by the

18   probation officer.

19         The seven day term will start on a Monday.  I am

20   directing that Mr. Waldman report to the marshals by 2 p.m. on

21   Monday, November 4, and I will recommend that Mr. Waldman must

22   be provided a Kosher diet.

23         MR. MARVINNY:  Your Honor, may I interject?  I think

24   the 4th is a Sunday.

25         THE COURT:  I'm sorry.  That's right, the 4th is a

1    Sunday.  It would be November 5.

2            MR. MARVINNY:  My request would have been that Mr.

3    Waldman be permitted to report on Monday the 19th of November.

4    That is a week that would be easier.  That is, Thanksgiving

5    week would be a week that would be easier for him to

6    accommodate his work needs.  I think the work will be much

7    slower that week, and I think he was hoping to serve his time

8    during that week.

9            THE COURT:  I was looking for a week that didn't

10   clearly have any major religious holidays in it, and for some

11   reason -- the week of November 19 doesn't appear to have any

12   major religious holidays.  So, Monday, November 19.

13           I believe that this sentence is reasonable within the

14   meaning of the law, appropriate and no greater than necessary

15   to address the statutory purposes of sentencing.

16           Does either counsel know of any legal reasons why the

17   sentence should not be imposed as stated?

18           MR. HELLMAN:  No.

19           MR. MARVINNY:  No, your Honor.

20           THE COURT:  The sentence as stated is imposed.

21           Is there a motion to dismiss the remaining

22   specifications?

23           MR. HELLMAN:  Yes, I make that motion that all

24   remaining specifications be dismissed in satisfaction.

25           THE COURT:  That motion is granted.  I must say

1    something to you about your appeal rights, Mr. Waldman.

2          You have the right to appeal this sentence.  If you

3    are unable to pay the cost of an appeal, you may apply for

4    leave to appeal in forma pauperis.  At your request, the Clerk

5    of the Court will file a notice of appeal for you.  Any notice

6    of appeal must be filed within 14 days of entry of the

7    judgment.

8          And, Ms. Aliperti, is the articulation of the

9    conditions consistent with what probation needs in terms of an

10   administrative point of view?

11         MS. ALIPERTI:  Yes.  And just one other point to

12   clarify.  Because Mr. Waldman's term of supervision was

13   revoked, would you like him to still remain supervised until

14   his self surrender date by our office?

15         THE COURT:  Yes.  So, I am stating that on the record

16   that the current conditions of supervision remain in place

17   until the surrender date, and so I suppose I will express it

18   that the term is revoked as of the surrender date, which is

19   November 19, and then will be reimposed following the release

20   from the seven days.

21         Is that all clear, or do we need to go over anything

22   else?

23         All right.  Thank you all.  And I wish you good luck.

24   We are adjourned.

25                              - - -